Gene THOMAS and Carolyn Thomas, Appellants

v.

Jeffery ALFORD, M.D., Sweetwater Medical Associates, P.L.L.C., and Robert Malone, M.D., Appellees.

No. 14–06–00796–CV.

Court of Appeals of Texas, Houston (14th Dist.).

July 19, 2007.

---

Gordon R. Cooper II, Houston, for appellants.

Erin E. Lunceford, Joel Randal Sprott, Laverne Carol Chang, Suzan Cardwell, Houston, for appellees.

Panel consists of Chief Justice HEDGES and Justices FOWLER and EDELMAN.

## OPINION

RICHARD H. EDELMAN, Justice.

In this medical malpractice case, Gene and Carolyn Thomas (the "Thomases") appeal an order dismissing with prejudice their claims against Jeffery Alford, M.D. ("Alford"), Sweetwater Medical Associates, P.L.L.C. ("Sweetwater"), and Robert Malone, M.D. ("Malone") on the grounds that: (1) the Thomases' expert reports were sufficient; and (2) the trial court abused its discretion by denying their request for an extension of time to file corrected expert reports. We affirm in part and reverse and remand in part.

## Background

The Thomases sued the appellees for failing to diagnose Mr. Thomas's cancer until after it became incurable. After filing suit, the Thomases filed three expert reports and curriculum vitae (collectively, the "reports"); [1] appellees each filed objections to each report and sought dismissal of the Thomases' claims; the Thomases filed responses to the objections; the trial court held a hearing on the objections; and the trial court issued interlocutory orders dismissing the Thomases' causes of action with prejudice.

## Standard of Review

In a health care liability claim, a claimant is required to timely serve on each party or their attorney one or more expert reports, with a curriculum vitae of each expert, for each physician or health care provider against whom a liability claim is asserted. Tex. Civ. Prac. & Rem.Code Ann. § 74.351(a) (Vernon Supp.2007).[2] If, as to a defendant physician or health care provider, a sufficient expert report is not timely served, then on the motion of the affected physician or health care provider, the trial court shall enter an order dismissing the claim with respect to the physician or health care provider, with prejudice to the refiling of the claim. Id. § 74.351(b)(2).

■ However, a court shall grant such a motion, challenging the adequacy of an expert report, only if it appears to the court, after a hearing, that the report does not represent an objective good faith effort to comply with the definition of an expert report in section 74.351(r)(6). Id. § 74.351(l). Under that definition, "expert report" means a written report by an expert that provides a fair summary of the expert's opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet those standards, and the causal relationship between that failure and the injury, harm, or damages claimed. Id. § 74.351(r)(6). Therefore, to constitute a good-faith effort, an expert report must discuss the standard of care, breach, and causation with sufficient specificity to inform the defendant of the conduct the plaintiff has called into question and to provide a basis for the trial court to conclude that the claims have merit. Jernigan v. Langley, 195 S.W.3d 91, 93 (Tex. 2006).

■ In reviewing the sufficiency of a report, the trial court should look no further than the report itself, which need not marshal all the plaintiff's proof, but cannot merely state the expert's conclusions about the required elements. Bowie Mem'l Hosp. v. Wright, 79 S.W.3d 48, 52 (Tex.2002). Rather, the expert must explain the basis of his statements to link his conclusions to the facts. Id. However, because a plaintiff need not present evidence in the report as if it were actually litigating the merits, the information in the report does not have to meet the same requirements as evidence offered in a summary judgment proceeding or at trial. Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios, 46 S.W.3d 873, 879 (Tex.2001). Nor must the report express the causal relationship in terms of reasonable medical probability or other "magic" words. Bowie, 79 S.W.3d at 53. Additionally, a claimant may satisfy any expert report re-

---

1. See Tex. Civ. Prac. & Rem.Code Ann. § 74.351 (Vernon Supp.2007).

2. Although some amendments to the statutes cited in this opinion became effective after the Thomases' cause of action accrued in 2002, we have cited to the current version of the statute for expedience because none of the subsequent amendments are material to our disposition.

quirement of section 74.351 by serving multiple reports of separate experts regarding different physicians or different issues, such as liability and causation, for a single physician. *See* Tex. Civ. Prac. & Rem.Code Ann. § 74.351(i).

A person is qualified as an expert to give opinion testimony on whether a physician departed from the accepted *standards of care* if he is a physician who is licensed in one or more states in the United States and: (1) is practicing medicine at the time such testimony is given or was practicing medicine at the time the claim arose; (2) has knowledge of accepted standards of medical care for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim; and (3) is qualified on the basis of training or experience to offer an expert opinion regarding those accepted standards of medical care. *Id.* §§ 74.351(r)(5)(A), 74.401(a), (g). In determining whether a witness is qualified on the basis of training or experience, the court shall consider whether, at the time the claim arose or at the time the testimony is given, the witness: (1) is board certified or has other substantial training or experience in an area of medical practice relevant to the claim; and (2) is actively practicing medicine in rendering medical care services relevant to the claim. *Id.* § 74.401(c).[3]

■ A person is qualified to give opinion testimony concerning the *causal relationship* between the injury, harm, or damages claimed and the alleged departure from the applicable standard of care only if the person: (1) is a physician; and (2) is otherwise qualified to render opinions on that causal relationship under the

Texas Rules of Evidence. *See* Tex. Civ. Prac. & Rem.Code Ann. §§ 74.351(r)(5)(C), 74.403(a) (Vernon 2005). To be so qualified under the Texas Rules of Evidence, an expert must have knowledge, skill, experience, training, or education regarding the specific issue before the court that would qualify the expert to give an opinion on that particular subject. *Broders v. Heise,* 924 S.W.2d 148, 153 (Tex.1996). When a party can show that a subject is substantially developed in more than one field, testimony can come from a qualified expert in any of those fields. *Id.* at 154.

■ A trial court's decision to dismiss under these provisions is reviewed for abuse of discretion. *Jernigan,* 195 S.W.3d at 93.

### Expert Reports

*Qualifications of Grossbard*

■ The Thomases' first issue contends, in part, that Dr. Grossbard was qualified to offer an expert opinion on the standard of care for Alford because he is extensively trained and experienced in treating cancer. Alford argues that Grossbard lacks training, knowledge, and experience regarding the standards of care applicable to a family practice physician. However, the standard is whether an expert: (1) is board certified or has other substantial training or experience *in an area of medical practice relevant to the claim;* and (2) is actively practicing medicine in rendering medical care services *relevant to the claim. See* Tex. Civ. Prac. & Rem.Code Ann. § 74.401(c). Because the claim in this case relates to the diagnosis and treatment of cancer, and Grossbard is board certified and practices

**3.** In determining whether an expert is qualified to offer expert testimony on whether a physician departed from accepted standards of medical care, a trial court may depart from the foregoing criteria if, under the circumstances, it determines that there is a good reason to admit the expert's testimony, in which event the court will state on the record its reason for admitting the testimony. Tex. Civ. Prac. & Rem.Code Ann. § 74.401(d) (Vernon 2005).

in the field of oncology, he is qualified to offer an opinion on the standard of care for the diagnosis and treatment of cancer.

### Adequacy of Reports as to Alford

■ The Thomases' first issue also contends that Grossbard's report adequately states the standard of care, breach, and causation elements pertaining to Alford. Regarding the first two of these, Grossbard's report, after reciting his qualifications and Mr. Thomas's treatment history, states:

> After reviewing these medical records, I conclude that the failure of Dr. Alford to arrange for appropriate follow-up of the right lower pulmonary nodule seen on the CT scan in 3/28/02 represented a significant deviation from the prevailing standard of care. The radiologist, Dr. Robert Malone, noted that the nodule had increased in size and that a neoplasm was "more likely." The appropriate standard would have been for Dr. Alford to follow up on the findings of this report and to proceed with needle biopsy or thoracoscopic biopsy in March 2002. Unfortunately, no biopsy was arranged and no follow-up chest CT was ever arranged.

Alford argues that Grossbard's report is deficient concerning the standard of care and breach in that it fails to identify: (1) whether the prevailing standard of care is that applicable to a family practice physician, such as Alford, or to an oncologist, such as Grossbard; and (2) the time frame in which a follow up CT should have been arranged, what the follow up tests would be expected to reveal, and what treatments would have resulted therefrom.

■ However, for this purpose, statements concerning the standard of care and breach need only identify what care was expected and not given with such specificity that inferences need not be indulged to discern them. *See Jernigan*, 195 S.W.3d

at 93–94; *Palacios*, 46 S.W.3d at 880. In this case, Grossbard's report specifies that the care expected but not given was to follow up on the findings in the March 28, 2002 report, that the nodule had increased in size and that a neoplasm was more likely, with a biopsy in March of 2002. Because this was adequate to inform Alford of the conduct the Thomases had called into question, it was not a proper basis to find the report deficient.

Regarding the causal relationship between Alford's failure to meet the standard of care and the injury claimed, Grossbard's report states:

> After a 47 month delay, the patient was found to have a metastatic well-differentiated adenocarcinoma involving the liver in 2/06. Based on my review of the records, it is apparent that the right lower nobe nodule present in 2002 served as the primary tumor.
>
> If Dr. Alford had proceeded with appropriate evaluation in 3/02, this patient more likely than not would have been diagnosed with an early stage lung cancer (stage I) that would have been surgically resectable and curable, likely without the need for chemotherapy or radiation therapy. When the patient's disease was diagnosed in 2/06, he had stage IV lung cancer for which only palliative therapy is available. Mr. Thomas' disease is incurable and will prove fatal. The median survival for patients with stage IV lung cancer is less than one year. Thus, the delay in diagnosis in this patient's lung cancer allowed his tumor to progress from stage I to stage IV and eliminated his chance for curative therapy.

In *Bowie*, the expert's report stated as to causation: "I do believe that it is reasonable to believe that if the x-rays would have been correctly read and the appropriate medical personnel acted upon those

findings then Wright would have had the possibility of a better outcome." 79 S.W.3d at 51. In finding this insufficient to set forth the causation element, the Court reasoned that:

[T]he report simply opines that Barbara might have had "the possibility of a better outcome" without explaining how Bowie's conduct caused injury to Barbara. We cannot infer from this statement, as the Wrights ask us to, that Bowie's alleged breach precluded Barbara from obtaining a quicker diagnosis and treatment for her foot. Rather, the report must include the required information within its four corners. Because the report lacks information linking the expert's conclusion (that Barbara might have had a better outcome) to Bowie's alleged breach (that it did not correctly read and act upon the x-rays), the trial court could have reasonably determined that the report was conclusory.

*Id.* at 53. (citations omitted). By contrast, Grossbard's report provides the link between Alford's alleged breach (failing to proceed with biopsy in March of 2002) and its conclusion on causation (obtaining an earlier diagnosis would have allowed treatment of the cancer while it was still curable). Because Grossbard's report thus provided adequate opinions on standard of care, breach, and causal relationship, the Thomases' first point of error is sustained, and we need not address their second point of error challenging whether the report of Fields was also sufficient in this regard.

### Adequacy of Report as to Malone

■ The Thomases' third point of error contends that Dr. Francis's report adequately stated the standard of care, breach, and causation elements pertaining to Malone. Malone argues that Francis's report either failed to state each element or stated it in a vague and conclusory manner. After reciting his qualifications as a diagnostic radiologist and the treatment history, Francis's report states:

My opinion based on the above findings is that there was a neoplastic nodule in the right lower lung visible on 3/28/02, which did not receive appropriate diagnostic follow up until almost four years later, in February 2006. At that time, there was evidence of widespread metastatic neoplasm, markedly reducing the chance for effective therapy and survival.

I have enclosed a copy of the Guideline for Communication, from the American College of Radiology Guidelines, a collection of practice guidelines formulated by the American College of Radiology, the organization representing most board certified radiologists in this country. As Stated [sic] in the guideline, unexpected abnormal findings seen on imaging studies should be "directly communicated" to the referring physician, as well as by the usual dictated and typed report which is issued for all imaging studies. *My own practice* is to telephone the referring physician about any unexpected findings such as suspected neoplasm, and document this telephone call in the report. I *feel that* faxing the report does not fulfill the recommendation for direct communication.

Therefore, it is my opinion that the radiologist, Dr. Malone, fell below the *standard of care for a board certified radiologist* by not directly communicating these unexpected findings. This failure to directly communicate these unexpected findings *contributed to the delay in this patient's diagnosis,* and *eventually may affect the patient's chances for survival.*

(emphasis added).

There are several problems with Francis's report. First, it is not apparent from the report whether the guideline referred

to is: (1) a standard of care for what *any* ordinarily prudent radiologist would do under the same or similar circumstances; or, alternatively, (2) a higher standard to which board certified radiologists should aspire. Second, the report does not state that the guideline *requires* telephoning the referring physician to meet the standard for direct communication, but only that Francis *views* the guideline as imposing that requirement. Third, Francis's conclusion that the delay in the patient's treatment resulted from Malone's failure to telephone Alford requires an assumption or inference, such as that: (1) Malone's office did not properly fax the report to Alford's office; (2) Alford's office received, but did not convey, the fax to Alford; (3) Alford received the fax but overlooked it; or the like. However, the report states no facts that either directly indicate any of these facts, or reasonably support any such inferences. Because it is also theoretically possible that Alford received, and was aware of, the fax, but failed or declined to take further action for other reasons, Francis's report is speculative in its conclusion on causation.[4] Lastly, Francis's report does not show that he has knowledge, training, or experience in cancer *treatment* that would qualify him to give an opinion on the likelihood that an earlier diagnosis could have produced a better outcome. Because the Thomases' third point of error thus fails to demonstrate that Francis's report satisfied the statutory requirements, it is overruled.

### Extension of Time

■ The Thomases' fourth point of error contends that the trial court abused its discretion by denying their request for an extension of time to file corrected expert reports if the filed reports were found deficient. However, the Thomases have not cited, nor have we found, any part of the record at which they sought, or the trial court made, any ruling on a motion for extension of time. *See* Tex.R.App. P. 33.1(a). More importantly, a ruling on such a motion is neither a final judgment nor a type of interlocutory order that may be appealed in a case before a final judgment is rendered. *See* Tex. Civ. Prac. & Rem.Code Ann. § 51.014 (Vernon 1997). Therefore, the Thomases' forth point of error presents nothing for our review and is overruled.

Accordingly, the judgment of the trial court is affirmed as to the dismissal of claims against Malone and reversed and remanded as to the dismissal of claims against Alford and Sweetwater.

---

4. To whatever extent Grossbard or Fields would have been qualified to provide such an opinion, neither of their reports mention Malone. *See Jernigan,* 195 S.W.3d at 94.