**Affirmed and Memorandum Opinion filed May 7, 2015.**



In The

# Fourteenth Court of Appeals

## NO. 14-14-00697-CV

### NATHAN HILTON, M.D, Appellant

### V.

### NEVILLYN WETTERMARK, Appellee

**On Appeal from the 295th District Court**
**Harris County, Texas**
**Trial Court Cause No. 2013-48056**

## M E M O R A N D U M   O P I N I O N

In this medical negligence case, appellee Nevillyn Wettermark was diagnosed with a cancerous growth on the heel of her foot. Appellant Nathan Hilton, M.D., administered two rounds of radiation therapy. Wettermark obtained subsequent treatment elsewhere for resection of her heel and, ultimately, amputation of her leg. Wettermark sued Hilton and others for medical negligence.[1]

---

[1] The other defendants are not parties to this appeal.

Pursuant to Section 74.351 of the Texas Civil Practice and Remedies Code, Wettermark filed an expert report by Gerald Cyprus, M.D. *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.351. Hilton objected to the adequacy of the report. *See id.* § 74.351(a).[2] The trial court granted Wettermark a thirty-day extension to file an amended report. *See id.* § 74.351(c).[3] Hilton objected to the amended report and moved for dismissal alleging (1) the report was "conclusory and inadequate as to proximate cause" and (2) Cyprus had "no qualifications to opine on proximate cause." The trial court denied the motion, and Hilton appealed. We affirm.

## I.   STANDARD OF REVIEW

We review a trial court's ruling on the adequacy of a Chapter 74 report for an abuse of discretion. *See Fontenot Enters., Inc. v. Kronick*, No. 14-05-01256-CV, 2006 WL 2827415, at *1 (Tex. App.—Houston [14th Dist.] Oct. 5, 2006, no pet.) (mem. op.) (citing *Am. Transitional Care Cntrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 875 (Tex. 2001)). The trial court abuses its discretion if it acts arbitrarily, unreasonably, or without reference to guiding rules or principles. *Id.* at *2 (citing *Garcia v. Martinez*, 988 S.W.2d 219, 222 (Tex. 1999)). "An abuse of discretion does not occur merely because the appellate court may have decided a discretionary matter in a different way than the trial court." *Id.* (citing *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985)).

---

[2] Hilton's objections were as follows: (1) "no opinions about the standard of care"; (2) "no definite opinion that the standard of care was breached"; and (3) "conclusory and inadequate as to proximate cause."

[3] This order is not contained in the clerk's record, but the parties agree that the trial court granted a thirty-day extension.

## II. ADEQUACY OF OPINION ON CAUSATION

In his first issue, Hilton contends the trial court erred by denying the motion to dismiss because Cyprus's opinion on causation is conclusory and does not link Hilton's alleged negligence to Wettermark's damages.

A trial court must grant a motion to dismiss a plaintiff's suit if it appears to the court that the expert report does not represent an objective good faith effort to comply with the definition of an expert report in Chapter 74. *Thomas v. Alford*, 230 S.W.3d 853, 856 (Tex. App.—Houston [14th Dist.] 2007, no pet.) (citing Tex. Civ. Prac. & Rem. Code Ann. § 74.351(*l*)). Under that definition, an expert report must provide a "fair summary" of the expert's opinions regarding (1) applicable standards of care; (2) the manner in which the care rendered by the physician failed to meet the standards; and (3) the causal relationship between that failure and the injury, harm, or damages claimed. *See id.*; *Fontenot*, 2006 WL 2827415, at *4; *see also* Tex. Civ. Prac. & Rem. Code Ann. § 74.351(r)(6)). To constitute a good faith effort, an expert report must discuss these elements with "sufficient specificity to inform the defendant of the conduct the plaintiff has called into question and to provide a basis for the trial court to conclude that the claims have merit." *Thomas*, 230 S.W.3d at 856 (citing *Jernigan v. Langley*, 195 S.W.3d 91, 93 (Tex. 2006)).

An expert report need not marshal the plaintiff's proof or meet the requirements of evidence offered at trial, but it cannot merely state the expert's conclusions on the issue of causation. *See id.*; *Fontenot*, 2006 WL 2827415, at *4; *see also Jelinek v. Casas*, 328 S.W.3d 526, 539 (Tex. 2010). An expert must explain the basis of the expert's statements to link the conclusions to the facts. *Thomas*, 230 S.W.3d at 856; *Fontenot*, 2006 WL 2827415, at *5. "It is not sufficient for an expert to simply state that he or she knows the standard of care

and concludes it was [or was not] met." *Palacios*, 46 S.W.3d at 880 (alteration in original, quotation omitted).

Cyprus did more than merely state that he knew the standard of care and conclude that Hilton failed to meet it. Cyprus identified at least three breaches of the standard of care. He concluded that Hilton fell below the standard of care by (1) "failing to obtain a surgical opinion about the resectability of the squamous cell skin cancer lesion"; (2) "failing to recognize that radiotherapy is relatively contraindicated in a patient presenting with [the pre-existing condition of scleroderma]"; and (3) "not initially attempting surgical resection before subjecting Mrs. Wettermark to radiotherapy." Cyprus opined that each of these alleged breaches caused Wettermark "to be damaged by radiotherapy leading to poor response to subsequent treatment, poor healing and ultimate amputation of her leg." Further, Cyprus opined that "Hilton's decision to utilize radiotherapy despite its being relatively contraindicated, instead of using excision techniques available[,] significantly damaged Mrs. Wettermark and led to the deterioration of her leg to the point that amputation became necessary." Cyprus also opined, "Based on a reasonable degree of medical certainty, had Dr. Hilton obtained a surgical opinion about resectability of the lesion, amputation would not have been necessary." Finally, Cyprus identified a number of alternative treatments that "would have been effective . . . to prevent the spread of the cancer to other areas of the body," and he opined, "Had a technique other than radiotherapy been utilized, amputation would not have been necessary."[4]

As these excerpts highlight, Cyprus linked Hilton's alleged failures with Wettermark's injury, opining that radiotherapy led to poor healing and response to

---

[4] The alternative techniques were identified as follows: "photodynamic therapy, curettage, and electrodessication treatments, cryosurgery, Mohs surgery removing a layer at a time, and other techniques."

subsequent treatment and made the ultimate amputation "necessary." In particular, Cyprus based this opinion on the fact that Hilton's chosen course of treatment—radiotherapy without a surgical consultation—is "relatively contraindicated" for a person with Wettermark's pre-existing condition of scleroderma. Cyprus supports his conclusion by identifying treatments other than radiotherapy that he opines would have prevented the spread of cancer and made amputation unnecessary.

In these respects, Cyprus's report is distinguished from the reports discussed in Hilton's authorities. Hilton contends that the Texarkana Court of Appeals' decision in *Hardy v. Marsh* is directly on point. *See* 170 S.W.3d 865 (Tex. App.—Texarkana 2005, no pet.). We disagree. Notwithstanding the fact that the *Hardy* court was reviewing the *granting* of a motion to dismiss for an abuse of discretion,[5] we note that the *Hardy* court also concluded that the expert report failed to state the applicable standard of care and its breach. *See id.* at 869–70. Thus, the report naturally would not have been able to link any breach to the plaintiffs' injuries. The plaintiffs relied on one paragraph from the report to show causation:

> It is my opinion that this patient should have had a consultation with a vascular surgeon in view of his complaints before his discharge on 8-9-02. I recognize fully the importance of his other medical problems. It is my opinion then that if this patient had had more immediate treatment that a salvage of his right leg would have been more probable.

*Id.* at 870. The court of appeals reasoned that nothing linked the alleged inaction (immediate treatment as opposed to discharge) with the injury (amputation). *Id.* Importantly, the expert report in *Hardy* did not (1) "state what additional

---

[5] Due to the deferential nature of the abuse-of-discretion standard of review, this court has questioned the usefulness of cases in which the courts of appeals reviewed trial courts' dismissals, rather than as in this case, when we review the trial court's *denial* of a motion to dismiss. *See San Jacinto Methodist Hosp. v. Bennett*, 256 S.W.3d 806, 817–18 (Tex. App.—Houston [14th Dist.] 2008, no pet.).

procedures or treatment would have been provided by the surgeon"; (2) "connect the consultation to avoidance of the amputation"; or (3) "set forth factors or explain the medical basis for [the expert's] opinion" that immediate treatment would have made salvage of the leg "more probable." *Id.*

Unlike the *Hardy* expert report, Cyprus's report identifies various other treatment methods that would have been effective to prevent the spread of the cancer, which would have made amputation unnecessary. Cyprus connected the lack of a surgical consultation with avoidance of the amputation, and Cyprus explained that the basis of his opinion was that radiotherapy is contraindicated for a patient such as Wettermark presenting with the condition of scleroderma.

Hilton also relies on *Windsor v. Maxwell*, 121 S.W.3d 42 (Tex. App.—Fort Worth 2003, pet. denied). The divided court of appeals reviewed the *granting* of a motion to dismiss, and the majority relied heavily on the standard of review by declining to hold that "the trial court acted unreasonably and without reference to any guiding principles in failing to draw [an] inference" in favor of the plaintiff's expert report. *Id.* at 50.[6] Further, the expert report contained no causal relationship between the breach and injury whatsoever. *See id.* at 48–49. The report indicated nothing more than that the injury followed the breach. *Id.* at 49 ("Nor would a report be sufficient if it merely states, as related here, that the injury followed the act. Here, evidence that the infarction occurred after the catheter remained in the artery does not establish that maintaining the catheter in the artery *caused* the artery to be pierced . . . ."). Unlike in *Windsor*, Cyprus's report does more than merely state that the amputation followed Hilton's failure to meet the standard of care. Cyprus states that amputation "became necessary" as a result of Hilton's failures, and his failures led to Wettermark's poor healing and response to

---

[6] *See also supra* note 5.

6

subsequent treatments and, ultimately, to amputation of Wettermark's leg. Cyprus described other treatments that would have prevented the spread of Wettermark's cancer.

Hilton also relies on the divided court of appeals' decision in *Estorque v. Schafer*, 302 S.W.3d 19 (Tex. App.—Fort Worth 2009, no pet.). The court of appeals reversed the trial court's decision to deny the motion to dismiss because the expert report was inadequate on the issue of causation. *Id.* at 29. In particular, the report did not explain the expert's basis for his opinion that other physicians' failures to consult a urologist or gynecologist "caused worsening or progression of [the plaintiff]'s listed conditions" and resulted in the loss of functioning of the plaintiff's kidney. *Id.* at 28. The *Estorque* court reasoned that the report did not "explain how the injuries would not have occurred if [the defendants] had obtained consults from a urologist and gynecologist earlier." *Id.* at 29. Cyprus, however, identified other treatments alternative to radiotherapy that Cyprus opined would have been effective to prevent the spread of Wettermark's cancer without the need for amputation. Cyprus also opined that the radiotherapy itself for a person with scleroderma led to poor healing and poor response to subsequent treatments, which led to the ultimate amputation.

Hilton also relies on the El Paso Court of Appeals' decision reversing the trial court's denial of a motion to dismiss in *Clapp v. Perez*, 394 S.W.3d 254 (Tex. App.—El Paso 2012, no pet.). In that case, however, the plaintiff's expert made broad and sweeping allegations against multiple physicians involved in treating the plaintiff. *See id.* at 259–62. The failure of the expert to assign specific standards of care to specific physicians was critical to the court of appeals' holding that the report failed to adequately describe the standards of care, breaches, and causation. *See id.* at 260–62 ("[The report] does not indicate whether the standard of care was

7

applicable to Dr. Clapp, Dr. Gagot, or both. If the standard of care was the same for Drs. Clapp and Gagot, then Dr. Herrera was required to have so stated in his report. . . . Although Dr. Herrera asserts that Drs. Clapp and Gagot breached the standard of care by failing to insert the nasal-gastric tube before surgery, he never identifies or explains what Drs. Clapp and Gagot each specifically did or failed to do in breaching the standard of care. . . . Dr. Herrera fails to link Perez's death to any specific physician."). Cyprus's report does not suffer from the same lack of specificity as the report concerns only Hilton's conduct.

Finally, Hilton cites to another divided court of appeals' decision in *Craig v. Dearbonne*, 259 S.W.3d 308 (Tex. App.—Beaumont 2008, no pet.). The court of appeals reversed the trial court's denial of the motion to dismiss because the expert report did not adequately link the defendant's breach of the standard of care and delayed treatment for pneumonia with the patient's death. *See id.* at 313. In particular, the report "fail[ed] to explain what treatment would have been effective, but was not provided, or whether the treatment Craig provided would have been effective if it had been started earlier." *Id.* As discussed above, Cyprus identified treatments alternative to radiotherapy that he opined could have been employed to prevent the spread of Wettermark's cancer, and "[h]ad a technique other than radiotherapy been utilized, amputation would not have been necessary." Further, the instant case does not primarily concern a delay-of-treatment, but rather the appropriate treatment to be administered in the first place—radiotherapy versus another surgical option.

This court's decision in *Thomas v. Alford* highlights the distinctions between adequate and inadequate expert reports on the issue of causation. *See* 230 S.W.3d 853 (Tex. App.—Houston [14th Dist.] 2007, no pet.). This court reversed the trial court's dismissal of the plaintiff's claims against one physician because the expert

report was adequate on the issue of causation. *See id.* at 860. This court reviewed the report of Grossbeard, which addressed Alford's negligence:

> If Dr. Alford had proceeded with appropriate evaluation in 3/02, this patient more likely than not would have been diagnosed with an early stage lung cancer (stage I) that would have been surgically resectable and curable, likely without the need for chemotherapy or radiation therapy. When the patient's disease was diagnosed in 2/06, he had stage IV lung cancer for which only palliative therapy is available. Mr. Thomas' disease is incurable and will prove fatal. The median survival for patients with stage IV lung cancer is less than one year. Thus, the delay in diagnosis in this patient's lung cancer allowed his tumor to progress from stage I to stage IV and eliminated his chance for curative therapy.

*Id.* at 858. This court held that the trial court abused its discretion by dismissing claims against Alford because Grossbeard's report was adequate on the issue of causation. *See id.* at 859. Importantly, "Grossbeard's report provides the link between Alford's alleged breach (failing to proceed with biopsy in March of 2002) and its conclusion on causation (obtaining an earlier diagnosis would have allowed treatment of the cancer while it was still curable)." *Id.* This court did not require the Chapter 74 expert report to explain, for example, why a stage I cancer was surgically resectable, why a stage IV cancer was incurable, or how a cancer will spread without surgical removal. Apparently, these are the types of underlying details Hilton would require of Cyprus's report. But, this level of detail is unnecessary for the defendant to be informed of the conduct complained of and for the trial court to conclude that the claims have sufficient merit to withstand a challenge at the expert-report stage. *See id.*

In concluding that Grossbeard's report was adequate in *Thomas*, this court distinguished the report from one found to be inadequate by the Supreme Court of Texas in *Bowie Memorial Hospital v. Wright*, 79 S.W.3d 48 (Tex. 2002). In

9

*Bowie*, the expert opined that the patient "would have had the possibility of a better outcome" if x-rays were properly read and medical personnel acted upon those findings. *Id.* at 51. The supreme court held that the trial court reasonably could have determined that the report was conclusory because the report lacked information linking the expert's conclusion (that the patient might have had a better outcome) to the hospital's alleged breach (that it did not correctly read and act upon x-rays). *Id.* at 53. Cyprus's report, on the other hand, adequately links his conclusions (that "amputation became necessary" as a result of radiotherapy and that "amputation would not have been necessary" if an alternative treatment had been employed to prevent the spread of cancer) with Hilton's alleged breaches (that he failed to consult a surgeon, that he failed to recognize radiotherapy is contraindicated for a patient with scleroderma, and that he did not initially attempt surgical resection).

Another decision from this court is illustrative. In *San Jacinto Methodist Hospital v. Bennett*, the patient developed decubitus ulcers, and the expert opined in his report that the hospitals' failures to optimize the patient's nutrition and hydration caused the formation of the ulcers. 256 S.W.3d 806, 816 (Tex. App.—Houston [14th Dist.] 2008, no pet.). The expert opined that the hospitals

> breached the standard of care by failing to perform ongoing assessment, reassessment and care planning to prevent, detect, and manage decubitus ulcers, and treatable predisposing factors such as poor nutrition and hydration breaches of the standard of care were the proximate cause of Ms. Taylor's decubitus formation and failure to heal a decubitus, together with poor nutrition and hydration.

*Id.* The expert also opined, "Had the standard of care been met by the staff . . . as outlined above, the specific outcome, based upon reasonable medical probability, would have been prevention and healing of decubitus formation, and maintenance

10

of good nutrition and hydration." *Id.* at 817. The trial court denied the hospitals' motion to dismiss, and this court affirmed. *Id.* at 819.

Although this court noted that the report "could have been more specific," this court could not conclude that the trial court's ruling was an abuse of discretion. *Id.* at 817. The trial court reasonably could have concluded that the report was sufficient because the report indicated that if each hospital had followed the standard of care, the patient would have maintained good nutrition and hydration, ulcer formation would have been prevented, and those ulcers already present would have healed. *Id.*

Similar to the *Bennett* court, we cannot conclude that the trial court acted arbitrarily, unreasonably, or without reference to guiding rules or principles when the court ruled that Cyprus's report was adequate on the issue of causation. Cyprus identified the alleged breaches of the standards of care and linked those alleged breaches to Wettermark's injuries—the radiotherapy, as opposed to surgical resection, resulted in poor response to subsequent treatment, poor healing, and ultimate amputation of her leg. The trial court did not abuse its discretion by denying Hilton's motion to dismiss.

Hilton's first issue is overruled.

### III. QUALIFICATIONS TO OPINE ON CAUSATION

In his second issue, Hilton contends that the trial court abused its discretion when it failed to dismiss Wettermark's lawsuit because Cyprus "was not qualified to opine on the proximate cause of the injuries and damages made the basis of [Wettermark's] lawsuit." However, Hilton did not make this complaint to the trial court within the time period prescribed by the Legislature. Thus, the trial court

would not have abused its discretion in denying the motion based on a challenge to Cyprus's qualifications.

Under Section 74.351(a), an objection to the sufficiency of an expert report must be made "not later than the later of the 21st day after the date the report is served or the 21st day after the date the defendant's answer is filed, failing which all objections are waived." Tex. Civ. Prac. & Rem. Code Ann. § 74.351(a). In *Lucas v. Clearlake Senior Living Ltd. Partnership*, this court held that a defendant waived its objection to the expert's qualifications to opine on causation when the objection was not made within twenty-one days of the original report but was made only in response to the amended report. 349 S.W.3d 657, 658 (Tex. App.— Houston [14th Dist.] 2011, no pet.). Allowing a new objection to be made to an expert's qualifications when both the original and amended report included opinions on causation (even if deficient) would be "contrary to the clear language of the statute." *Id.* at 663.

The First Court of Appeals reached a similar conclusion in *Marino v. Wilkins* and examined the interplay between subsections (a) and (c) of the statute. *See* 393 S.W.3d 318, 331–32 (Tex. App.—Houston [1st Dist.] 2012, pet. denied). Subsection (c) empowers the trial court to grant a single thirty-day extension for the plaintiff to cure any deficiencies the trial court finds in the initial report, as the trial court did in response to Hilton's objections to Cyprus's initial report. *See id.* (citing Tex. Civ. Prac. & Rem. Code Ann. § 74.351(c)). Our Houston sister court explained:

> Permitting defendants to remain silent about a particular complaint when objecting to an initial report and then raise that objection in response to an amended report containing the same recitations as an earlier report would thwart the plaintiff's opportunity to cure that deficiency because the trial court is not empowered to grant another extension of time to cure the objected-to deficiency. The consequence

12

of that interpretation is dismissal of a plaintiff's claim with prejudice without the plaintiff being afforded the opportunity to cure a curable deficiency that is not only contemplated, but required, by section 74.351(c).

For these reasons, we hold that a defendant may not raise new objections to recitations repeated in an amended report from the initial report if the defendant did not properly raise those objections within twenty-one days of the initial report. Such objections are waived.

*Id.* at 332.

Hilton did not challenge Cyprus's qualifications in Hilton's objections to Cyprus's original report or otherwise within twenty-one days from the date of service.[7] As in *Marino*, Hilton's untimely objection to Cyprus's qualifications would thwart the statutory scheme. In fact, Hilton objected in its motion to dismiss "to any consideration of any additional extension of time to cure deficiencies in the report(s) [because] Chapter 74.351 allows the court to grant one, and only one, extension of time to cure deficiencies in Chapter 74.351 filings." Hilton did not timely object to any deficiencies about Cyprus's qualifications, and the record does not reflect that the   trial court sustained any such objection. Allowing Hilton to assert this objection to the amended report would effectively prevent Wettermark from being able to cure any deficiencies. Such a result is not compatible with the statutory scheme that "contemplates a safety-net for plaintiffs in which they are given one opportunity to cure deficiencies pointed out in their expert report before their claims are dismissed with prejudice." *Id.* (citing *Scoresby v. Santillan*, 346 S.W.3d 546, 549 (Tex. 2011)).

---

[7] Hilton stated in his objections to the amended report that, at the April 21, 2014 hearing on the objections to the original report, an objection was raised to Cyprus's qualifications to opine on proximate cause. We do not have a reporter's record from this hearing. Presuming without deciding that such an objection was raised at the hearing, the objection still was untimely because the hearing occurred more than twenty-one days after December 9, 2013, the date on which Cyprus's original report was served.

Further, we note that although Cyprus's amended report contained more detail about the causation element, Cyprus's opinion on causation was ultimately the same opinion as in the original report, which stated:

> 4. Because of the lack of items mentioned above (no initial biopsy by Dr. Mousa, not obtaining a surgical opinion of resectability of this lesion by Dr. Ballew and Dr. Hilton) led to subsequent poor response to treatment, with recurrence, and poor wound healing, along with ultimate amputation.

In his original objections to this report, Hilton specifically complained that the report was "conclusory and inadequate as to proximate cause." Because the original report and amended report both contained the same ultimate opinion about causation, Hilton's subsequent objection to Cyprus's qualifications was waived even though the original report may have been deficient. *See Lucas*, 349 S.W.3d at 662–63 & n. 6 (expert report did not contain "new" testimony about causation even though the original report did not contain "magical words" such as "cause" or "causation"; noting that the defendant objected to the original report's opinion on causation but not the qualifications of the expert to opine on causation). And, both of the reports contained identical paragraphs related to Cyprus's qualifications and his curriculum vitae. *See Marino*, 393 S.W.3d at 332 (failure to object to part of a report results in waiver when the amended report contains identical recitations). Thus, Hilton had every opportunity to object to Cyprus's qualifications within twenty-one days of service of the original report. *See Lucas*, 349 S.W.3d at 663 & n.7 (noting that the original report contained a paragraph about the expert's qualifications, so the original report would have fairly apprised the defendant of the lack of qualifications even though the original report did not contain the expert's curriculum vitae).

14

Faced with an untimely objection to Cyprus's qualifications, the trial court would not have acted arbitrarily, unreasonably, or without reference to guiding rules or principles by denying this ground in Hilton's motion to dismiss. The trial court did not abuse its discretion.

Hilton's second issue is overruled.

## IV. CONCLUSION

Having overruled both of appellant's issues, we affirm the trial court's order denying Hilton's motion to dismiss.[8]


/s/    Sharon McCally
Justice


Panel consists of Chief Justice Frost and Justices Boyce and McCally.

---

[8] In one sentence of her fifty-page brief, Wettermark contends, "The Appellant's appeal is frivolous, and Appellee should be entitled to attorney's fees and costs under Tex. R. App. P. 45." This request does not include a "clear and concise argument for the contentions made, with appropriate citations to authorities." Tex. R. App. P. 38.1(i); Tex. R. App. P. 38.2(a)(1). We decline to address it. *See, e.g.*, *Fox v. Alberto*, No. 14-13-00007-CV, — S.W.3d —, 2014 WL 6998094, at *3 (Tex. App.—Houston [14th Dist.] Dec. 11, 2014, no pet. h.) (holding that a party waived error by inadequate briefing when the party's assertion was conclusory and did not include argument or analysis).